```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MAURICE CLARK, et. al.        :          CIVIL ACTION
                              :
           v.                 :
                              :
COLWYN BOROUGH, et. al.       :          NO. 12-3668
```

<u>MEMORANDUM</u>

McLaughlin, J.                                    August 10, 2015

This action arises from disputes among a Colwyn Borough resident, Colwyn Borough police officers, and Colwyn Borough officials.  Plaintiff Maurice Clark, Jr., a Colwyn Borough resident, has brought claims against Colwyn Borough Police Officer Trevor Parham, Colwyn Borough, Colwyn Borough Deputy Police Chief Wendell Reed, and Colwyn Borough Council President Tonette Pray based on Parham's alleged use of excessive force, false arrests, and malicious prosecutions. Plaintiffs Kevin Banks, Sr., Bryant Sterling, Clinton Craddock, and Wesley Seitz, all of whom were members of the Colwyn Borough Police Department during the events at issue (the "Officer Plaintiffs"), have brought claims against Colwyn Borough, Reed, and Pray for violations of their procedural Due Process rights and violation of the Pennsylvania Whistleblower Law.  Craddock has also brought claims for violation of his First Amendment rights against Colwyn Borough, Reed, and Pray.  Finally, Banks has brought claims for unlawful retaliation against Parham.

The Court decides here two motions for summary judgment:  Parham's motion for summary judgment as to Banks's retaliation claim and defendants Colwyn Borough, Reed, and Pray's motion for summary judgment as to all claims against them.  The motions for summary judgment were filed on April 10, 2015.  Parham did not move for summary judgment as to Clark's claims against him.  All officer plaintiffs withdrew their claims for due process violations based on their liberty interest in their reputations.  Additionally, Plaintiff Banks withdrew his retaliation claim in response to Parham's motion.

There are no genuine disputes of material facts and the defendants are entitled to judgment as a matter of law.  The Court, therefore, grants the defendants' motions for summary judgment in their entirety.[1]


I.   Summary Judgment Record[2]

The plaintiffs' claims arise from a tenuously connected series of events that began in July 2011.  Generally, the plaintiffs have alleged the existence of a racially and

---

[1]      Clark's claims against Parham are the only claims that remain.

[2]      All facts herein are taken in the light most favorable to the plaintiffs.  There are many facts in the summary judgment record, however, that are not relevant to the claims at issue. The Court, therefore, has limited the discussion of the summary judgment record only to relevant facts.

politically fueled conspiracy between Colwyn Borough Council
President Tonette Pray and Colwyn Borough Police Chief Wendell
Reed that targeted Colwyn Borough resident Maurice Clark, Jr.
and Colwyn Borough police officers who disagreed with Pray and
Reed.  The support plaintiffs offer for these allegations,
however, is speculative and not supported by the summary
judgment record.


     A.   <u>Defendants Tonette Pray, Wendell Reed, and Trevor
Parham</u>

The plaintiffs have brought claims against Tonette
Pray, Wendell Reed, and Trevor Parham.

During the relevant time period, Tonette Pray served
as the Colwyn Borough Council President as one of seven borough
council members.  Pray was a democrat, and the three other
democratic council members typically voted with Pray.  Pray Dep.
Tr. 43-44; Van Aucken Dep. Tr. 31-35, 63-64.

During the relevant time period, Wendell Reed served
as deputy chief of the Colwyn Borough Police Department.  Reed
Dep. Tr. 9, 11-14.

Finally, during the relevant time period Trevor Parham
was a corporal with the Colwyn Borough Police Department.
Parham Dep. Tr. 24-25.  On April 23, 2012, Parham tased a
juvenile detainee who was in the custody of the Colwyn Borough

Police Department.  Parham was terminated following the incident
for failing to complete appropriate use of force reports and
forms.  Parham Dep. Tr. 30, 45, 102; Parham Dep. Ex. 3.

     B.   Plaintiff Maurice Clark, Jr.

On two separate occasions in the summer of 2011,
Trevor Parham, at the time a Colwyn Borough police officer,
arrested and placed in jail 64-year-old Maurice Clark, Jr., a
private citizen; Clark was arrested once in mid-July, 2011 and
again on August 26, 2011 on disorderly conduct charges.  Clark
Dep. Tr. 33-36.

There is a dispute of fact as to whether Parham had
justification to arrest Clark in either instance.  Clark has
testified that in each of the two reports Parham filled out
following his arrests of Clark, he falsely stated that Clark had
threatened to fight him.  Clark has also claimed that Parham
"berated [him] verbally" during the arrests and "intimidated"
him by making noise with a taser out of his line of sight.
Clark was found not guilty on the disorderly conduct charges.
Clark Dep. Tr. 34-36, 51-53.

Clark complained to Colwyn Borough officials about Parham's conduct during his arrests.[3] Following his July 2011 arrest, Clark called Reed three or four times to complain about Parham's conduct.  In November 2011, Clark sent two written complaints to Reed and members of the Colwyn Borough Council. Clark also testified that he generally complained to Pray about Parham's conduct.  Clark Dep. Tr. 79, 105-06; Clark Dep. Exs. 1, 2.

Parham continued to monitor Clark following Clark's July and August arrests.  On multiple occasions in fall 2011, Parham drove up and down the block on which Clark lived, sometimes slowing down as he passed Clark's residence and giving Clark "dirty looks".  Clark Dep. Tr. 57-78, 75-77.

Additionally, on November 8, 2011, Parham announced to his fellow Colwyn Borough police officers that if they saw Clark following police vehicles they should "lock him up" and that Parham would take care of the paperwork.[4]  Officers Banks and

---

[3]    In October 2009—two years before his disorderly conduct arrests—Clark complained to Pray about Parham's conduct during a traffic stop.  Clark Dep. Tr. 19-24.

[4]    The plaintiffs have highlighted the fact that Parham has offered conflicting statements about Pray's role in his directive to arrest Clark if he was seen following patrol vehicles.  In his December 16, 2011 response to Reed's investigation, Parham stated that "[a]t no time did [he] reference that Council President Pray or any other member of the borough council in regards to this matter."    Pls. Ex. D. Parham testified as his deposition, however, that Pray had

Sterling were present when Parham made this announcement.
Clark, however, was never arrested after the announcement.
Banks Dep. Tr. 39-40; Sterling Dep. Tr. 67-68; Pls Ex. 5.

     C.   The Officer Plaintiffs

  i.  Kevin Banks

      Banks joined the Colwyn Police Department in January
2011 as an hourly, part-time police officer; he was also
employed full-time by SEPTA.  Banks was not a civil service
employee and was not a member of the Colwyn Borough Police
Department's collective bargaining unit.  He was paid an hourly
wage.  Banks worked only Saturday and Sunday shifts.  Banks Dep.
Tr. 14, 22, 25-34, 39, 74, 143.

      On December 13, 2011, Banks outlined several
complaints about Parham in a memo to Reed and Colwyn Borough
Mayor Daniel Rutland.  The memo outlined the following
complaints: (1) he believed Parham left an offensive cartoon of
a police officer on the department bulletin board; (2) on
December 3, 2011, Parham directed another officer to arrest
Clark if she saw Clark near a police vehicle because he was
harassing police officers; (3) on December 4, 2011 Parham told
Colwyn Borough police officers that he had a "verbal order" from

---

informed him that Clark had been seen following police vehicles.
Parham Dep. Tr. 24-26.

Pray to arrest Clark if he was seen behind a patrol vehicle; (4) Parham signed in for a shift that he did not work; and (5) Parham ordered him to walk on foot patrol when other officers were not required to do so.  Banks also reported Parham's conduct to the Pennsylvania State Police.  Banks Dep. Tr. 44-45, 57-59; Banks Dep. Ex. 8.

Reed conducted an investigation in response to Banks's complaints.  He interviewed Parham and other officers and did not find support for Banks's accusations.[5]  See Banks Dep. Ex. 9.

On December 16, 2011, Banks put a doctor's note under Reed's door to notify him that he would not be able to return to work at the police department until February 2012 due to workplace stress.  On December 31, 2011, Reed ordered Banks to return his police equipment and identification card; Reed did not tell Banks that he had been terminated by the Colwyn Borough Council.  Banks did not become aware that he was terminated by the Borough Council until January 3, 2012.  Banks Dep. Tr. 61, 70-73; Banks Dep. Ex. 8.


ii.  Clinton Craddock

Craddock joined the Colwyn Police Department in November 2010 as an hourly, part-time officer. Craddock also

---

[5]     The plaintiffs have characterized Reed's investigation as a "whitewash", but have failed to offer any facts to support this allegation.

worked as a part-time officer in the Yeadon Borough Police
Department.  Craddock was not a civil service employee and was
not a member of the Colwyn Borough Police Department's
collective bargaining unit.  He was paid an hourly wage.
Craddock understood that as a part-time officer he was an at-
will employee. Craddock Dep. Tr. 13-16, 26, 47.

        On February 6, 2012, Craddock arrested Colwyn Resident
Marco Fiore for driving under the influence of alcohol and
marijuana.  On February 7, Craddock was notified that Parham had
released Fiore with a disorderly conduct citation on Reed's
orders.  Reed told Craddock that he was "tired of being laughed
out of court" with cases like Fiore's.  In response, Craddock
called the District Attorney's office and was advised to file
charges anyway; Craddock filed the charges, though the charges
were later dismissed because evidence went missing.  On February
17, 2012, Parham wrote Craddock up for failing to appear at
Fiore's arraignment and for parking his car in the wrong parking
space.  Craddock Dep. Tr. 30, 36-38, 45-46, 263-35.

        In March 2012, Craddock complained to Reed that Parham
had been drinking in his patrol vehicle.  Specifically, on March
9, 2012, Craddock sent a memorandum to Reed explaining that he
saw "an empty Home Sutter bottle (alcohol)" located in Parham's
patrol vehicle.  In two memoranda sent on March 23, 2012,
Craddock told Reed and Pray that he had a picture of Parham

8

holding an empty bottle of alcohol in his patrol vehicle.  He asked that the issue be "immediately addressed by administration."  Craddock Dep. Tr. 167-68, 94, 174; Pls. Exs. H-J.

In April 2012, Craddock reported to Channel Six News that Parham had tased a juvenile detained in the Colwyn Borough Police department.  Craddock has testified that a fellow officer, John Moore, told him that Reed believed Craddock had reported the incident to the media.[6]  Craddock Dep. Tr. 147-49; 164-65.

On July 5, 2012, Craddock received a letter from the Colwyn Borough Police department notifying him that disciplinary proceedings were being considered against him based on his June 8, 2012, removal of police files from the station in violation of policy and in opposition to direct order.  The files were related to an excessive force claim that an arrestee had made against Craddock; the disciplinary action resulted in Craddock

---

[6]       The plaintiffs' evidence regarding Reed's knowledge of Craddock's media report is hearsay evidence and is currently in a form not admissible at trial. Fed. R. Evid. 802.  At the summary judgment stage, however, the Court may consider evidence presented by the non-moving party that is "capable of being admissible" at trial, even if it is not currently in admissible form.  Philbin v. Trans Union Corp., 101 F.3d 957m 961 (3d Cir. 1996); Williams v. West Chester, 891 F.2d 458, 466 (3d Cir. 1989).  The Court will therefore consider this evidence as the out-of-court declarant—Moore—could later present this evidence in the form of direct testimony at trial.  Williams, 891 F.2d at 466 n. 12.

being taken off the Colwyn Borough Police Department schedule.[7]
Craddock Dep. Tr. 17, 20, 22-25; Def. Ex. 3; Craddock Dep. Tr.
17.

iii. Seitz

Seitz began working for the Colwyn Police Department
as an hourly, part-time officer in July 2011.  Seitz was not a
civil service employee and was not a member of the Colwyn
Borough Police Department's collective bargaining unit.  He was
paid an hourly wage.  Seitz Dep. Tr. 36-38.

Seitz complained to Reed that Parham would arrive at
work in his pajamas and advise young officers that "the more
they did, the more they could get in trouble."  Seitz also
complained that his colleague Officer Hayes would sleep while
working night shift.  Seitz Dep. Tr. 48, 50.

Seitz conducted an independent investigation of
Parham's tasing of the juvenile detainee.  During his
investigation, he notified Pray and Reed that Parham had
improperly filled out paperwork following the tasing.  Seitz

---

[7]      The plaintiffs characterize the charges as "trumped
up", but point to no evidence in the summary judgment record to
support that characterization.

Further, Craddock does not dispute that he did remove
files from the police department.  Craddock, however, testified
that he took the files because he was concerned that he was
being "set up" by Reed and believed statements had been removed
from the files.  Craddock Dep. Tr. 17-25, 74-78, 80-85.

ultimately recommended that Parham should be suspended during the investigation and that criminal charges should be considered.  Seitz was suspended without pay—and returned to work— twice because it was suspected that he leaked information about the tasing incident to the press; Seitz denies that he shared any information with the press.  Seitz Dep. Tr. 64-66, 70-72, 76-78, 184-186; Pls. Exs. P, Q.

On July 28, 2012, Officer Hayes filed a sexual harassment complaint against Seitz.  Hayes claimed that Seitz had sexually harassed her in the workplace by undressing in public areas of the department; she submitted photos of Seitz undressed while at work.[8]  On July 19, 2012, Officer Hayes had filed a complaint with the Equal Employment Opportunity Commission based on Seitz's conduct.  Seitz was terminated on August 2, 2012, as a result of Officer Hayes allegations and the borough's "zero tolerance" policy on sexual harassment.  Seitz Dep. Ex. 2; Pray Dep. Tr. 195, 199.

---

[8]      Seitz disputes the merits of Hayes's sexual harassment claim, and challenges Hayes's motivation for filing the lawsuit. He does not dispute, however, that Hayes's filed a complaint and submitted pictures of him undressed in a public area of the police station.  Seitz Dep. Tr. 102-113.

iv.  <u>Bryant Sterling</u>

Sterling began working for the Colwyn Police Department as an hourly, part-time officer in December 2010. Sterling was not a civil service employee and was not a member of the Colwyn Borough Police Department's collective bargaining unit.  He was paid an hourly wage.  Sterling Dep. Tr. 27-29.

During his time as a Colwyn Borough Police Officer, Sterling made multiple complaints to Pray and Reed regarding department operations.[9]  Specifically, in 2011, Sterling complained to Reed about Officer Hayes sleeping in the Police Department.  Sterling also informed Reed that he heard Parham's November 2012 directive to arrest Clark if Clark was seen following police vehicles.  Sterling Dep. Tr. 68-70, 73, 90-92.

In January 2012, Sterling was informed that the Colwyn Borough Mayor wanted him removed from the schedule due to a complaint that had been filed by the mother of an arrestee.[10]  As

---

[9]      These complaints, which are not at issue in this lawsuit, include complaints that the department missed a payroll and failed to offer an explanation and complaints that patrol vehicles had expired inspection stickers.  Sterling Dep. Tr. 52-54; 82-83.

[10]      On November 24, 2011, Sterling had arrested a juvenile for driving without headlights and for driving while intoxicated.  Because no one was available to immediately process the juvenile, Sterling held him for approximately ninety minutes and then released him without filing charges.  Sterling Dep. Tr. 33-35, 37-39.

of January 10, 2012, Sterling was taken off the Colwyn borough
schedule.  Sterling Dep. Tr. 40, 42, 50; Pray Dep. Tr. 176-177.

II.  Analysis[11]

    A.    Summary Judgment Is Appropriate As To Clark's
           Supervisory Liability Claims Against Reed and Pray

        Clark has claimed that Pray and Reed are liable for
Parham's alleged Fourth Amendment violations on a theory of
supervisory liability; Clark has brought Fourth Amendment claims
against Parham for excessive force, false imprisonment, and
malicious prosecution stemming from his arrests in July and
August 2011.  Because there are no facts in the summary judgment
record to support supervisory liability claims for either Pray
or Reed, the Court grants summary judgment as to those claims.

        Supervisory liability for Section 1983 violations can
exist when a supervisor exhibits deliberate indifference to the
rights of individuals with whom their subordinates interact;

---

[11]      Under Federal Rule of Civil Procedure 56, a party
moving for summary judgment must show that there is no genuine
issue as to any material fact and that judgment is appropriate
as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party
bears the initial burden of demonstrating the absence of any
genuine issue of material fact.  Celotex Corp. v. Catrett, 477
U.S. 317, 323 (1986).  Once a properly supported motion for
summary judgment is made, the burden shifts to the nonmoving
party, who must set forth specific facts showing that there is a
genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 250 (1986).  The mere existence of some alleged
factual dispute between the parties will not defeat an otherwise
properly supported motion for summary judgment.  Id. at 247–48.

supervisory liability cannot be based on a theory of respondeat superior and thus plaintiffs must show the supervisor's personal involvement in the alleged wrongs.  See Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990)(requiring "some affirmative conduct by the supervisor that played a role" in the alleged violation.  A plaintiff can show the supervisor was personally involved with evidence that the supervisor: (1) participated in the violation; (2) directed his subordinates to violate the plaintiff's rights; or (3) had knowledge of and acquiesced to the subordinate's violations.  Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d Cir. 1997).

Clark has argued that Reed and Pray participated in the conduct, had knowledge of or acquiesced to Parham's conduct, and failed to supervise Parham.

To establish such a claim for supervisory liability based on acquiescence to conduct, the plaintiff must:

> (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.

Brown v. Muhlenberg Twp., 269 F.3d 205, 126 (3d Cir. 2001). Additionally, "it is not enough for a plaintiff to argue that

the constitutionally cognizable injury would not have occurred
if the superior had done more than he or she did;" instead, a
plaintiff must "identify specifically what [a defendant] failed
to do that evidences deliberate indifference." Sample v.
Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989).

The summary judgment record contains no evidence that
Reed or Pray encouraged Parham to arrest Clark in July or August
of 2011, nor does it contain any evidence that Reed or Pray
acquiesced to Parham's conduct or failed to sufficiently train
Parham.  In fact, almost all of the record evidence highlighted
by Clark relates to Reed and Pray's alleged conduct following
the arrests, in no way supporting liability based on the arrests
themselves.[12]

Additionally, the summary judgment record contains no
evidence of a pattern of false arrests on the part of Parham
prior to his arrests of Clark.

Because a reasonable jury could not find that Pray or
Reed were liable as supervisors for Parham's conduct, the Court

---

[12]    The only pre-arrest evidence of Reed or Pray's
knowledge of Parham's pre-July 2011 conduct is: (1) Clark's
testimony that in 2009 he complained to Pray regarding Parham's
conduct during a traffic stop; Clark complained that Parham was
"hostile," not that Parham's stop was without justification and
(2) Clark's testimony that he complained to Reed about his July
2011 arrest. Clark Dep. Tr. 19-24.

grants summary judgment as to Clark's Section 1983 claims against both Pray and Reed.

   B.   Clark's Monell Claim Against Colwyn Borough

         The plaintiffs argue both that Tonette Pray is a "policy maker" sufficient to subject Colwyn Borough to liability for Parnham's actions and that Colwyn Borough Police Department failed to train Parhm.[13]  Because the summary judgment record contains no evidence to support Clark's Monell claim, summary judgment should be granted.

         A municipality cannot be held liable under Section 1983 for the actions of its employees on a respondeat superior theory.  Monell v. Dept. of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978). When a municipal entity is sued under Section 1983, "the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir.1996).

         There also must be a "'direct causal link between a municipal policy or custom and the alleged constitutional

---

[13]         Although the plaintiffs initially claimed that Wendell Reed was a policy maker in their amended complaint, they have conceded that he is not a policy maker in the opposition to the defendants' motion for summary judgment.

deprivation' to ground municipal liability." Jiminez v. All Am.
Rathskeller, Inc., 503 F.3d 247, 249–50 (3d Cir.2007) (quoting
City of Canton v. Harris, 489 U.S. 378, 385 (1989)). Liability
is imposed "when the policy or custom itself violates the
Constitution or when the policy or custom, while not
unconstitutional itself, is the 'moving force' behind the
constitutional tort of one of its employees." Colburn v. Upper
Darby Twp., 946 F.2d 1017, 1027 (3d Cir.1991) (quoting Polk
Cnty. v. Dodson, 454 U.S. 312 (1981)).

A plaintiff can demonstrate the existence of a policy
by showing that a decision maker possessing final authority to
establish an entity's policy with respect to the action issues
an official proclamation, policy, or edict. Mulholland v. Gov't
Cnty. of Berks, 706 F.3d 227, 237 (3d Cir.2013). A course of
conduct is considered to be a custom when, although not
authorized by law, officials' practices are permanent and well-
settled so as to virtually constitute law. Id.

There are three situations in which acts of an
employee may be deemed to be the result of a policy or custom of
the municipal entity for which he works: (1) the appropriate
officer or entity promulgates an applicable policy statement and
the act complained of is an implementation of that policy; (2)
without a formally announced policy, federal law is violated by
an act of the policymaker; or (3) "the policymaker has failed to

17

act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'"  Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir.2003) (alteration in original) (quoting City of Canton, 489 U.S. at 390).

        To establish a Monell claim for failure to train or supervise, "liability under Section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir.1999) (quoting City of Canton, 489 U.S. at 388).  Additionally, "the identified deficiency in a city's training program must be closely related to the ultimate injury"; in other words, "the deficiency in training [must have] actually caused" the constitutional violation.  City of Canton, 489 U.S. at 391.  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  Connick v.

Thompson, 131 S.Ct. 1350, 1360 (2011) (quoting Bd. of Cnty. Comms of Bryan Cnty. v. Brown, 520 U.S. 397, 409 (1997)).[14]

To determine whether a municipality's alleged failure to train its employees amounted to deliberate indifference, the plaintiff must demonstrate that:  "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." Doe v. Luzerne Cnty., 660 F.3d 169, 179–80 (3d Cir.2011) (quoting Carter, 181 F.3d at 357).

First, the summary judgment record contains no evidence that Tonette Pray is a policy maker sufficient to subject Colwyn Borough to municipal liability.  Pray is a member of the seven-person Colwyn Borough Council.  Though the plaintiffs speculated that Pray "controls" the council and thus "controls" the police force, there is no evidence in the summary

_____

[14]     Deliberate indifference be shown without a pattern of prior violations in only a narrow range of cases. There, a plaintiff must demonstrate that a constitutional violation was sufficiently foreseeable.  See Connick, 131 S.Ct. at 1366; City of Canton, 489 U.S. at 390 ("[I]n light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to that need.").

judgement record to support this claim.  Further, the only
evidence of Pray's possibly relevant "policies" that the
plaintiffs present are her alleged November 2011 instructions to
arrest Clark if he was seen following a police vehicle; these
instructions, even if considered a policy, cannot be causally
related to Clark's July and August 2011 arrests.

Additionally, the summary judgment record contains no
evidence of a constitutionally deficient policy or practice that
is <u>causally</u> related to Clark's alleged injuries.[15]  The
plaintiffs allege that the following policies are
constitutionally deficient: (1) lack of basic training on the
use of tasers; (2) knowledge of the legal definition of an
arrest; (3) the need to fill out use-of-force reports; (4) the
proper handling of evidence.  The plaintiffs also allege a
"pattern of constitutional violations," without identifying what
those violations may be.  Additionally, the plaintiffs' expert
concludes, without factual support, that Colwyn Borough police
officers had "learned that noncompliance with policies will have
no adverse effects on their performance or careers."  McCauley
Rep., Pls. Ex. U.  The summary judgment record, however,
contains no evidence that any policy or practice or failure to

---

[15]        Although the plaintiffs have alleged policies and
practices of Colwyn Borough that, if true, may be
constitutionally deficient, none of those polices is related in
any way to Clark's Fourth Amendment claims.

20

train identified by the plaintiff was related in any way to Parham's arrests of Clark.

C.   Officer Plaintiffs' Procedural Due Process Claims Against Reed, Pray, and Colwyn Borough

The police officer plaintiffs have each advanced a procedural due process claim based on the loss of the property interest in their hourly positions with the Colwyn Borough Police Department.[16]  Because the summary judgment record contains no facts that support these claims, the Court grants the defendants' motions for summary judgment.

To establish a procedural due process claim, a party must demonstrate that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life liberty or property, and (2) the procedures available to him did not provide due process of law."  Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ., 574 F.3d 214, 219 (3d Cir.2009) (quotations omitted).

Each officer plaintiff has brought procedural due process claims for their loss of the property interest in the jobs with the Colwyn Borough Police Department.  Because the

---

[16]     In their amended complaint, the officer plaintiffs' also brought due process claims based on alleged damage to their liberty interest in their respective reputations.  The officer plaintiffs, however, dismissed those claims following oral argument in an August 4, 2015 letter to the Court.

officers were hourly, part-time officers who cannot establish a property interest in their employment, the Court should grant summary judgment as to due process claims based on their loss of employment.

Whether a public employee has a property interest in his employment sufficient to establish a due process claim is a question of state law.  Hill v. Borough of Kutztown, 455 F.3d 225, 234 (3d Cir. 2006); see also Board of Regents v. Roth, 408 U.S. 564, 577 (1972).  Public employees in Pennsylvania have a property interest in their employment only if they can "establish a legitimate expectation of continued employment through either a contract or a statute."  Pipkin v. Pennsylvania State Police, 693 A.2d 190, 193 (Pa. 1997).

No contract or statute provides hourly police officers with an expectation of continued employment.  Although Pennsylvania law provides that "[n]o person in any police...force in any borough may be suspended without pay, removed or reduced in rank" except for limited reasons,  8 Pa. C.S.A. § 1190,  it limits the definition of "police force" to:

> [a] police force organized and operating as prescribed by law, the members of which devote their normal working hours to police duty or duty in connection with the bureau, agencies and services connected with police protection work and who are paid a stated salary or compensation for the work by the borough. As used in this subchapter, the term shall not include any of the following:

(4) Extra police serving from time to time or <u>on an hourly or daily basis</u>.

8 Pa. § 1170 (emphasis added).  Thus, police officers who serve on an hourly rather than a salaried basis are not protected.

In interpreting Section 1170 in the context of due process claims, courts in this District have uniformly found that part time officers do not have a continued expectation of employment under the statute.  See <u>Stevens v. Telford Borough</u>, No. 11-7216 2014 WL 4056952 at *6 (E.D.Pa. Aug 14, 2014)(finding that an officer who worked on an hourly basis was "specifically excluded by statute from the due process protections afforded to full-time officers."); <u>Rosati v. Borough of Hellertown</u>, No. 91-6484 1992 WL 396769 at *2-3 (E.D.Pa. Dec. 24, 1992)(finding that because a part-time officer was paid on an hourly, rather than a salaried, basis, he was considered "extra police" and had no property interest in his employment); see also <u>Mariano v. Borough of Dickson City</u>, 2014 WL 5795679 (M.D.Pa. Nov. 6, 2014).

There is no dispute that each plaintiff was a part-time officer paid on an hourly basis.  Each officer plaintiff had a part time contract, was not a salaried employee of the Colwyn Borough Police Department, and did not receive benefits from the Borough.  Additionally, no officer had a contract with Colwyn Borough that established a continued expectation of employment.

D.   <u>Qualified Immunity</u>

Both Reed and Pray have argued that they are entitled to qualified immunity for Clark's supervisory claims.  The Court, however, does not need to reach the question of qualified immunity because there is no evidence in the summary judgment record to support Clark's constitutional claims against Reed and Pray.

E.   <u>The Officer Plaintiffs' Whistleblower Claims Against Reed, Pray, and Colwyn Borough</u>

Each officer plaintiff has argued that he was terminated in violation of the Pennsylvania Whistleblower Law after making a report of wrongdoing to members of the police department or Borough Counsel.  Because there are no questions of material fact as to these claims and the defendants are entitled to judgment as a matter of law, the Court grants the defendants' motion for summary judgment.

Pennsylvania law provides that:

No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or

24

     appropriate authority an instance of wrongdoing...by a
     public body....

43 P.S. 1423(a).  A "whistleblower" is "a person who witnesses

or has evidence of wrongdoing...while employed and who makes a

good-faith report...to one of the person's superiors, to an

agent of the employer, or to an appropriate authority."  Id.  In

order to establish retaliatory termination under the act, a

plaintiff must demonstrate: (1) wrongdoing and (2) a causal

connection between the report of wrongdoing and adverse

employment action.  Golaschevsky v. Dep't of Envtl. Protection,

554 Pa. 157, 720 A.2d 757, 758–59 (1998).

          The Whistleblower Law does not protect every complaint

or critical report that an employee makes regarding his

employer; the law protects only reports of narrowly-defined

wrongdoing or waste.  To establish a whistleblower claim, a

plaintiff must specify how his employer is guilty of wrongdoing.

Johnson v. Resources for Human Dev., 789 F. Supp. 2d 595, 601-02

(E.D.Pa. 2011) (citing Gray v. Hafer, 168 Pa.Cmwlth. 613, 651

A.2d 221, 225 (1994), aff'd, 542 Pa. 607, 669 A.2d 335 (1995)).

Wrongdoing is defined as a "violation which is not of a merely

technical or minimal nature of a Federal or State statute or

regulation, of a political subdivision ordinance or regulation

or of a code of conduct or ethics designed to protect the

interest of the public or the employer."  43 Pa. Stat. Ann. §

1422.  Reports of vague or subjectively wrong conduct are insufficient to constitute wrongdoing under the act.  See Riggio v. Burns, 711 A.2d 497, 501 (Pa. 1998) (finding that there was no wrongdoing where regulations were not expressly violated); see also Anderson v. Board of School Dir. Of Millcreek Tp. School Dist., 574 F. App'x 169, 173-74 (3d Cir. 2014).

To establish the causal connection required by the Whilstleblower Law, the plaintiff must "show by concrete facts or surrounding circumstances that the report [of wrongdoing or waste] led to [the plaintiff's] dismissal, such as that there was specific direction or information received not to file the report or [that] there would be adverse consequences because the report was filed." Golaschevsky, 720 A.2d at 759.  Thus, the plaintiff must present evidence of more than a report of wrongdoing and a subsequent termination.  Johnson, 789 F. Supp. 2d at 602.

If a plaintiff succeeds in establishing a prima facie case of violation of the Whistleblower Law, the burden shifts to the defendants to establish that there were independent and legitimate reasons for the termination.  Golaschevsky, 683 A.2d at 1305.  If the defendant meets this burden, the plaintiff must then demonstrate that the reason was pretextual.  Id.

1. <u>Kevin E. Banks</u>

Banks has alleged that he was terminated in violation
of the Whistleblower Law after he made several complaints about
Parham's behavior in his December 13, 2011 memorandum to Reed,
including Parham's directive that Clark should be arrested if he
was seen following police vehicles.  None of the complaints made
by Banks rises to the level of "wrongdoing" required by the
Whistleblower Law.  In his memorandum, Banks failed to identify
any conduct by Parham that violated any statute, policy, or
regulation.  Rather, Banks reported vague, subjectively wrong,
and perhaps unprofessional conduct on the part of Parham.  The
Whistleblower Law does not protect such reports.

Further, even assuming Banks had reported wrongdoing
as required by the Whistleblower Law, the summary judgment
record does not contain the necessary concrete evidence that
Banks's reports were causally related to his termination.  The
summary judgment record contains evidence that Banks was
terminated following his notifying Reed on December 16, 2011
that he would not be able to work again until February 2012.
The plaintiffs have failed to present any non-speculative
evidence that the defendants' stated reason for terminating
Banks was pretextual.

2.   Clinton Craddock

Craddock has alleged that he was terminated in violation of the Whistleblower Law after he (1) complained to Reed about Parham's possible drinking in his police vehicle and (2) reported to Channel Six News that Parham improperly tased a juvenile detainee.  Craddock's complaint regarding Parham's tasing of the juvenile detainee appears to rise to the level of "wrongdoing" required by the Whistleblower Law.  Though Craddock's complaint does not identify conduct that violates a specific statute, policy, or regulation, it unquestionably addressed potentially unlawful conduct on the part of Parham. The Court finds, therefore, that Craddock made a report of "wrongdoing" under the Whistleblower Law.

The summary judgment record, however, contains no concrete evidence that Craddock's reports were causally related to his termination.  Golaschevsky, 720 A.2d at 759.  The summary judgment record contains evidence that Craddock's removal of files related to an excessive force complaint from the police department.  The plaintiffs have failed to present any non-speculative evidence that the defendant's stated reason for terminating Craddock was pretextual.[17]

---

[17]     Craddock's disagreement with the reason for his termination and criticism of the way it was handled do not establish pretext.

### 3.   Wesley Seitz

Seitz has alleged that he was terminated in violation of the Whistleblower Law after he began an investigation into Parham's tasing of a juvenile detainee and shared his findings with the mayor, Reed, and Pray.  Seitz's investigation concluded that the incident should be investigated by Colwyn Borough's Criminal Investigation Division.  Seitz's investigative report unquestionably outlined unprofessional and dangerous conduct on the part of Parham.  Though Seitz's report does not identify conduct that violates a specific statute, policy, or regulation, it discussed potentially unlawful conduct on the part of Parham. The Court finds, therefore, that Seitz reported "wrongdoing" under the Whistleblower Law.

The summary judgment record, however, contains no concrete evidence that Seitz's reports were causally related to his termination.  The summary judgment record contains evidence that Seitz was terminated as a result of the sexual harassment claim filed by Officer Hayes, and Seitz has offered no evidence to support his claim that the complaint was "bogus."  The plaintiffs have failed to present any non-speculative evidence that the defendants' stated reason was pretextual.

4.   Bryant K. Sterling

Sterling has alleged that he was terminated in violation of the Whistleblower law after he (1) complained about Parham's directive to arrest Clark if he was seen following police vehicles and (2) complained about Officer Hayes sleeping on the job.  Neither complaint by Sterling rises to the level of "wrongdoing" required by the Whistleblower Law.  Rather, the summary judgment record suggests that Sterling complained about merely unprofessional conduct.

Further, even assuming Sterling had reported wrongdoing as required by the Whistleblower Law, the summary judgment record contains no concrete evidence that Sterling's reports were causally related to his termination.  The summary judgment record contains evidence that Sterling was terminated following complaints made by the mother of a juvenile arrestee. The plaintiffs have failed to present any non-speculative evidence that the defendants' stated reason for terminating Banks was pretextual.

F.   Craddock's First Amendment Claims Against Pray, Reed, and Colwyn Borough

Craddock has brought a First Amendment retaliation claim against Pray, Reed, and Colwyn Borough based on (1) the "write up" placed in his file by Parham after he reported

Fiore's dropped charges to the District Attorney and (2) his termination following his tip to Channel Six news.  Because there are no material issues of fact as to either claim and the defendants are entitled to judgment as a matter of law, the Court grants the defendants' motion for summary judgment as to Craddock's First Amendment claim.

Public employees do not give up their First Amendment rights upon employment, but "the government's countervailing interest in controlling the operation of its workplaces" limits the First Amendment's ordinarily broad protections.  Lane v. Franks, 134 S.Ct. at 2369, 2377 (2014)(citing Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).

To establish a First Amendment retaliation claim, a public employee plaintiff must demonstrate two things: (1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action.  Flora v. County of Luzerne, 776 F.3d 169, 174-75 (3d Cir. 2015); see also Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir.2006).

A plaintiff must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish that the protected speech was a

substantial cause of the retaliatory action.  Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir.2007).  Absent that proof, the plaintiff must demonstrate that the trier of fact could infer causation based on the record as a whole.  Id.

If the "employee establishes both of those predicates, the burden shifts to the employer to show that it would have taken the same action even if the speech had no occurred."  Flora, 776 F.3d at 175.


### a.   File Note by Parham

Craddock's speech regarding the Fiore case was made in the scope of his official duties, foreclosing a First Amendment claim.  "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).  The central question is whether the speech at issue "is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."  Lane, 134 S.Ct. at 2379.  Charging arrestees such as Fiore is unquestionably within the scope of Craddock's ordinary duties as a Colwyn Borough Police Officer; thus, his request for direction from the District Attorney regarding filing charges against Fiore is within the ordinary

scope of his responsibilities and does not offer First Amendment protection.

        b.   <u>Termination after News Report</u>

      Craddock has successfully established that his report to Channel Six news was a matter of public concern and outside the scope of his official duties, affording the speech First Amendment protection.

      Craddock, however, has failed to satisfy the second element of a retaliation claim: there is no evidence in the summary judgement record to support causation.  Temporal proximity between a protected activity and the retaliatory action only establishes causation when it is "unusually suggestive".  <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 281 (3d Cir. 2000).  The Third Circuit has found that to be "unusually suggestive" the alleged retaliatory act must occur within days of the protected conduct, not within months.  Id.; <u>see also</u> <u>Shellenberger v. Summit Bancorp., Inc.</u>, 318 F.3d 183, 189 (3d Cir. 2003).  Craddock's termination took place more than three months after his report to Channel Six news.  There is insufficient temporal proximity to establish causation.

      Finally, as discussed above, the defendants have demonstrated a legitimate, non-retaliatory basis for Craddock's

termination:  the removal of police files from the Colwyn Borough police station.

The Court, therefore, grants the defendants' motion for summary judgment as to Craddock's First Amendment claim.


An appropriate order shall issue.